UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD SHAMON and <br> PATRICIA SHAMON, <br><br> Plaintiffs <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 04-11674-WGY <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF, RONALD SHAMON'S PROPOSED FINDINGS OF FACT**

1.  On February 9, 2001, The Plaintiff, Ronald Shamon, was seen at the Brockton VA Hospital by his primary care physician, Dr. Simona Retter-Berch, for a routine office visit. During the course of this visit, Dr. Retter-Berch scheduled a routine screening examination (flexible sigmoidoscopy) for colorectal cancer.

2.  On November 29, 2001, the Plaintiff, Ronald Shamon, was again seen by Dr. Retter-Berch, at the Brockton VA Hospital. During the course of this visit, Mr. Shamon complained of some neck discomfort associated with an automobile accident that occurred several day s before. A rectal examination performed at that time revealed "no external hemorrhoids ? palpable internal hemorrhoids." In response to these complaints, Dr. Berch prescribed a regimen of stool softeners, psyllium powder and hemorrhoidal powder as needed. She further noted that he had a "previously scheduled gastrointestinal screening exam coming up".

A.   THE SIGMOIDOSCOPY PROCEDURE

3.   On December 7, 2001, the Plaintiff, Ronald Shamon, presented to the Boston Veterans Administration Hospital (the "VA Hospital") for a routine flexible sigmoidoscopy procedure. At the time that he presented for this sigmoidoscopy procedure, Mr. Shamon was not experiencing any active gastrointestinal complaints. Rather, as reflected in Dr. Retter-Berch's November 29, 2001 note, the procedure was "previously scheduled", and was being performed solely for purposes of screening for colorectal cancer.

4.   Shortly after arriving at the VA Hospital on December 7, 2001, Mr. Shamon received a fleet enema administered by one of the VA staff nurses. Mr. Shamon did not experience any pain or discomfort during the course of this procedure. (Mr. Shamon was not informed of the risks associated with the simoidoscopy procedure prior to the performance of the procedure. Moreover, the Defendant has lost the consent form that Mr. Shamon allegedly signed prior to the procedure). He was then seen by Dr. Chi Zhang, a first-year GI fellow with very limited experience in performing flexible sigmoidoscopies. Although the VA Hospital's own internal guidelines required that Dr. Zhang be directly supervised by an experienced attending physician, Dr. Zhang began the sigmoidoscopy procedure without benefit of any supervision. Mr. Shamon experienced excruciating pain upon Dr. Zhang's initial insertion of the sigmoidoscope. Following this initial insertion of the scope, Dr. Zhang made an additional attempt at inserting the scope without success. Shortly after inserting the scope for the second time, Dr. Zhang exclaimed that he had gone "too high." Mr. Shamon experienced considerable pain and discomfort during Dr. Zhang's second unsuccessful attempt at inserting the sigmoidoscope. Because Dr. Zhang was unable to properly insert the sigmoidoscope, he instructed Dolores Kirby, a VA Hospital nurse assisting Dr. Zhang in the

procedure, to retrieve Dr. Mancos De Cunha Pedrosa, an experienced attending physician, who was forced to intervene in the procedure.

5. Immediately upon entering the examination room, Dr. Pedrosa noticed that there was some fecal matter covering the lens of the sigmoidoscope, thereby preventing Dr. Zhang from adequately visualizing the lumen. As a result, he instructed Dr. Zhang to stop the procedure immediately. Dr. Pedrosa then removed the sigmoidoscope, and proceeded to instruct Dr. Zhang on the proper method for cleaning fecal matter from the lens of the scope. He subsequently reinserted the scope, and completed the procedure. Neither Dr. Zhang nor Nurse Kirby has any recollection of the procedure. Although his note relating to the procedure does not reflect it, Dr. Pedrosa recalls Mr. Shamon exhibiting pain upon insertion of the sigmoidoscope. Dr. Pedrosa also acknowledges that he was required to intervene in the procedure after observing fecal matter attached to the lens of the sigmoidoscope. He further acknowledges that he was required to remove the scope, clean fecal matter from the lens of the scope, and complete the procedure. Again, this fact is not reflected in Dr. Pedrosa's contemporaneous note relating to the procedure.

## II.  THE DEVELOPMENT OF THE PERIRECTAL ABSCESSES

6. Immediately following the procedure, Mr. Shamon began experience severe rectal pain. He also observed some blood on the toilet tissue that he used to wipe his rectum following a bowel movement that he took shortly after the procedure was completed. Over the course of the next several days, Mr. Shamon began to experience a loss of appetite along with severe rectal pain which made it difficult for him to walk. He also began to experience increasing constipation, rectal bleeding, fever and chills.

7. On December 11, 2001, he was seen at the Urgent Care Unit of the Brockton VA Hospital, where he was noted to have urinary retention. After being evaluated by the medical staff at the

Brockton VA Hospital, he was discharged home with an indwelling Foley catheter. He was further instructed to take amoxicillin, acetaminophen, stool softeners, a hemorrhoidal suppository and ibuprofen.

8.  Unfortunately, Mr. Shamon's condition continued to deteriorate following his discharge from the urgent care unit. As a result, he returned to the Brockton Urgent Care Facility on the following day. During the course of this visit, he was noted to have continued rectal pain, swelling around his anus, and a white count of 20,000 with a left shift. In light of these findings, the physicians at the Brockton VA Hospital concluded that Mr. Shamon had a probable perirectal abscess.

C.  THE SURGERIES

9.  Mr. Shamon was subsequently transferred to the West Roxbury VA Hospital for an emergency consultation with Dr. Gary Fitzpatrick, a general surgeon on staff at the VA Hospital. During the course of this consultation, Dr. Fitzpatrick informed Mr. Shamon that he likely had bilateral perirectal abscesses, and that immediate surgical intervention was required. In his deposition, Dr. Fitzpatrick characterized Mr. Shamon's condition at this time as "life-threatening" (Fitzpatrick deposition at p. 12).

10. On December 12, 2001, Mr. Shamon was taken to the operating room, where Dr. Fitzpatrick incised and drained two large bilateral abscesses. In his operative note, Dr. Fitzpatrick identified a clear causal connection between the December 7th sigmoidoscopy procedure and the abscesses that subsequently developed in Mr. Shamon's rectal area. Specifically, Dr. Fitzpatrick noted: "*Bimanual exam did not reveal an obvious large rectal tear, but the presumption is that this acute perirectal sepsis and cellulites was **most likely** the result of a microperforation five days previous.*" When asked for the basis of this conclusion during the course of his deposition, Dr. Fitzpatrick responded, in part,

4

*"Again, a man has a colonoscopy, 24 hours later has severe pain, and four days later has—you know, **res ipsa loquitor**."* (Fitzpatrick deposition at p. 19) The causal connection between the sigmoidoscopy procedure and Mr. Shamon's abscesses was affirmed by a number of Mr. Shamon's subsequent treating physicians.

11. Mr. Shamon lost an estimated 500 ccs of blood during the December 12th surgical procedure. Over the course of the next several days his hemoglobin and hematocrit dropped precipitously. He ultimately required the transfusion of two units of red blood cells. He also developed abdominal distention and an NG tube was inserted for decompression.

12. On December 18, 2001, Mr. Shamon was brought back to the operating room for an additional incision and drainage procedure. During the course of this procedure, the abscesses were irrigated and repacked. Mr. Shamon remained in the hospital until December 21, 2001, at which time he was discharged home with instructions to retain visiting nurses to aid him with wound care (sitz baths, etc.).

13. On January 11, 2002, at the request of the visiting nurse assigned to care for Mr. Shamon, he was again seen at the West Roxbury VA Urgent Care Unit for re-evaluation of his perirectal abscesses. At that time, one of the two abscesses was reported to be slightly red with drainage. Periodic bleeding from the Foley catheter was also noted. In response to these issues, Mr. Shamon was seen by Dr. Fernando Navarro, a general surgeon at the VA Hospital who performed yet another incision and drainage procedure. Following this procedure, Dr. Navarro suggested that Mr. Shamon continue home treatment with the visiting nurses and remain on oral antibiotics.

14. On February 27, 2002, Mr. Shamon was seen again in the Colorectal Surgery Clinic at the West Roxbury VA Hospital where he was noted to have a discharge from his anus and small bilateral openings in the old incisions. Consequently, Mr. Shamon was admitted for a repeat

5

incision and drainage of the perirectal abscesses, which took place on February 28, 2002. He remained hospitalized until March 3, 2002.

  15. On March 6, 2002, Mr. Shamon was seen by Robert R. Cima, MD, a colorectal surgeon at the West Roxbury VA. At that time, Mr. Shamon was noted to have oral thrush. In response, Dr. Cima recommended that Mr. Shamon continue with sitz baths after each bowel movement, maintain a regular diet, continue fluconazole for his oral thrush, return to the clinic in one week, and schedule an exam under general anesthesia to better assess the extent of the abscess. Lastly, mention of a colostomy was suggested if needed.

  16. On May 16, 2002, Dr. Cima performed an exam under anesthesia and noted an anal fistula, which required the performance of an anal fistulotomy.

D. <u>DR. PEDROSA'S ATTEMPT TO INFLUENCE DR. FITZPATRICK'S OPINION ON THE CAUSATION ISSUE—THE MISSING E-MAIL.</u>

  17. In his December 12, 2001 operative note, Dr. Fitzpatrick opined that Mr. Shamon's perirectal abscesses were "most likely" the result of a microperforation that occurred during the December 7, 2001 sigmoidoscopy procedure. On March 21, 2005, Dr. Fitzpatrick was deposed by Plaintiff's counsel. During the course of this deposition, Dr. Fitzpatrick testified that approximately six weeks prior to this deposition, Dr. Pedrosa contacted Dr. Fitzpatrick via e-mail and attempted to convince Dr. Fitzpatrick to change his opinion on the causation issue. Specifically, Dr. Pedrosa sent an e-mail to Dr. Fitzpatrick in which he stated, "Help, I've been sued. *"Refresh your memory"* (Fitzpatrick deposition at page 39). He (Dr. Pedrosa) said, "I've been …. I don't know whether it was sued or there's litigation involving a patient that I was involved in…and that the microperforation word had been used by me and that's caused a great deal of difficulty". (Fitzpatrick deposition at page 39.). Dr. Fitzpatrick went on to testify:

6

> Q.	And Dr. Pedrosa, now being implicated in this suit, was writing you an email saying, "Your note has become a problem, " something to that effect; correct?
> A.	Something like that.
> Q.	And he was looking for your support, now having been sued, for his position; correct?
> MR. WILMOT:	Objection
> Q.	Was he looking for your support of his position?
> A.	He just - - you know, we work together, sure, because he ah never heard of a perforated rectum on flexible sigmoidoscopy. I've never seen one. I've done a thousand rigid sigmoidoscopies, never caused a microperforation. It's exceedingly rare. (Fitzpatrick Deposition at pp. 41-42.)

The Plaintiff made repeated requests for production of the Pedrosa-Fitzpatrick e-mail during the course of discovery. In response to these requests, the Defendant informed the Plaintiff that this e-mail could not be located.

E.  THE DEFENDANT'S TREATMENT OF THE PLAINTIFF DEVIATED FROM THE APPLICABLE STANDARD OF CARE

18.  The Defendants, through the negligent actions of its employees, deviated from the applicable standard of care. Specifically, Dr. Zhang breached the standard of care of the average qualified physician practicing in 2001, taking into account advances in the profession and the medical resources available to him when he perforated Mr. Shamon's lower rectum during the December 7, 2001 sigmoidoscopy procedure. Perforation of the rectum is an exceedingly rare (it occurs at a rate of approx. 0.011%) complication of a flexible sigmoidoscopy procedure, and should not occur during a properly performed sigmoidoscopy procedure. ("A perforation of the rectum, which is the lower 10 centimeters of the GI tract, it's just unheard of. I've never heard of a case", Fitzpatrick deposition at p. 28). In this case, Dr. Zhang breached the standard of care by inserting the sigmoidoscope on multiple occasions despite the fact that the presence of fecal matter on the lens of the sigmoidoscope prevented him from obtaining adequate visualization of the lumen. This conclusion is supported by the fact that: (1) Mr. Shamon experienced excruciating pain upon Dr. Zhang's insertion of the sigmoidoscope; (2) Dr. Zhang made

7

multiple attempts at inserting the sigmoidoscope without success; (3) Dr. Pedrosa was required to intervene in the procedure and clean fecal matter off of the lens of the scope, thereby allowing adequate visualization of the lumen. The Defendant was also negligent in failing to provide adequate supervision to Dr. Zhang while he performed the sigmoidoscopy procedure.

F.  THE DEFENDANTS' DEVIATIONS FROM THE STANDARD OF CARE WERE A SUBSTANTIAL CONTRIBUTING FACTOR IN CAUSING PLAINTIFF'S INJURIES.

19.  The Defendants' deviations from the standard of care were a substantial contributing factor in causing the Plaintiff's pain, suffering and disability. The causal connection between the December 7, 2001 sigmoidoscopy procedure and the development of Mr. Shamon's bilateral perirectal abscesses is beyond question. In his December 12, 2001 operative note, Dr. Fitzpatrick noted "Bimanual exam did not reveal an obvious large rectal tear, but the presumption is that this acute perirectal sepsis and cellulites was most likely the result of a microperforation five days previous." In his deposition, Dr. Fitzpatrick used the term *res ipsa loquitor* when describing this causal connection.

20.  The Defendants, in particular Dr. Pedrosa, have advanced the theory that Mr. Shamon's abscesses may have pre-dated the sigmoidoscopy procedure. Unfortunately for the Defendants, there is absolutely no support for this theory in the record. First, Mr. Shamon exhibited absolutely no signs or symptoms of an infection/abscess prior to the sigmoidoscopy procedure at issue in this case. More importantly the Defendant's own medical expert witness expressly refutes this theory in his report. Specifically, in his report, Dr. Richter testified as follows:

> An abscess or infection developed subsequent to the sigmoidoscopy leading one to postulate that the mucosa was breached during the sigmoidoscopy. **Although Dr. Fitzpatrick did not find a perforation at the time of his initial exploration the temporal coincidence is sufficiently striking that it is my medical opinion that it is more likely than not that the subsequent infection that Mr. Shamon experienced was enhanced by some event at the time of his sigmoidoscopy.** Dr. Fitzpatrick stated this as the events or facts speak for themselves in his operative note and deposition. Mucosal breaches, which may allow bacteria to enter the perirectal tissues, include fissures, fistulae, microperforations as opposed to larger free perforations are only identified infrequently

8

later at surgical exploration. Mr. Shamon reported to a VA internist in November prior to his sigmoidoscopy some constipation and anorectal symptoms prior to his sigmoidoscopy. *Dr. Pedrosa questions whether his infection might have antedated the procedure. Although this hypothesis is possible, infections in this location are very painful and rarely subtle.*

Thus, it is beyond dispute that the perirectal abscesses that developed in Mr. Shamon's rectal area were caused by a perforation in the rectum that occurred during the December 7, 2001 sigmoidoscopy procedure.

21.     At all relevant times, Drs. Zhang, Pedrosa and Fitzpatrick were employees of the Defendant, and were acting within the scope of their employment.  (Stipulated.)

G.     THE DAMAGES

22.     The Plaintiff sustained severe and permanent injuries as a direct result of the Defendant's negligence. Specifically, the Plaintiff developed a life-threatening perirectal abscess as a direct result of the rectal perforation that occurred during the December 7, 2001 sigmoidoscopy procedure.  He was subsequently required to undergo four separate surgical procedures designed to assess and treat his perirectal abscesses. In addition, the Plaintiff was left with substantial and permanent loss of bodily function as a direct result of the Defendant's negligence.  According to the Defendant's own expert witness, Mr. Shamon suffers from continued perianal pain and discomfort, and he has been left with a permanently weakened sphincter muscle. (See Richter report).  According to Dr. Richter:  "Some of his pain, perhaps half, may derive from nerve and muscle injury due to the abscesses and the surgery, which might be palliated somewhat with analgesics but might continue indefinitely." (Richter report).  Mr. Shamon is also frequently required to bathe his rectum following bowel movements, and is often required to stuff cotton balls in his rectum to prevent leakage. In addition, he's required to use a  "doughnut" if he intends to sit for an extended period of time.  Moreover, Mr. Shamon has endured severe emotional

9

distress as a result of the injuries that he sustained due to the Defendant's negligence, and has required treatment for depression.

The Plaintiff reserves the right to supplement the above proposed findings of fact based upon evidence introduced at trial.

Respectfully submitted,

RONALD SHAMON and
PATRICIA SHAMON,

   /s/ Michael R. Perry
Michael R. Perry (BBO #555300)
HANIFY & KING, P.C.
One Beacon Street
Boston, MA  02108
(617) 423-0400

DATED:

(*440662*)