**EXHIBIT A**

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of the form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| Office of Regional Counsel (02) U.S. Department of Veterans Affairs 200 Springs Road, Building 61 Bedford, Massachusetts 01730 | Ronald R. Shamon — 8 Sanderson Drive — Plymouth, MA 02360 / Michael Perry — Hanify and King — 1 Beacon St. — Boston, MA 02108 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. or P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☐ CIVILIAN | 04-27-36 | M | 12-07-01 | 8:00 a.m. |

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof.) (Use additional pages if necessary.)

At the Jamaica Plain, Massachusetts, VA at 8:00 a.m. on December 7, 2001, during Dr. Zhang's first attempt to perform a sigmoidoscopy on me, the scope hurt so bad that I screamed out loud, "It hurts!" He replied, "I'm sorry." He then put the scope in a second time, and after several minutes he yelled out, "I go too high! I go too high!" His nurse ran out of the room to get Dr. Pedrosa, who came into the room and yelled out, "Stop! Stop!" With the scope still inside of me, Dr. Pedrosa said to me and to Dr. Zhang that he was taking over, explained to Dr. Zhang that the lens had feces on it and

See attached continuation.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

N/A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

See attached continuation.

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
| Patricia Shamon | 8 Sanderson Drive, Plymouth, MA 02360 |

| 12. (See instructions on reverse) | AMOUNT OF CLAIM (in dollars) | | | |
|---|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
| N/A | $500,000.00 | — | $500,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| *Ronald R. Shamon* (signature) | 508-833-9359 | 12/04/03 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000 plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109
Previous editions not usable.
Designed using Perform Pro, WHS/DIOR, Jun 98

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85) (EG)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

RS0249

RONALD R. SHAMON
CLAIM FOR DAMAGE CONTINUATION PAGES

**Item 8 continued.**

had to be removed to be cleaned before proceeding. Dr. Pedrosa cleaned the lens and reinserted the scope. While removing the scope, he explained to Dr. Zhang the procedure for removing feces from the sides of the colon by using the scope. As a result of this procedure there was a perforation of my intestine.

Within days of my sigmoidoscopy, because of pain from my anus, I was examined on 12/11/01 at Brockton VA by Dr. Tamler, who, despite my claim of pain, said that I have a rash on my anus. On 12/12/01 pain was more intense with high temperature. I was examined by Dr. Dickenson at Brockton VA, who ordered a blood workup and an ultrasound. They indicated two abscesses formed in my anus and an elevated white blood count. A catheter was inserted and I was transported to West Roxbury VA.

On 12/12/01 at West Roxbury VA I was operated on by Dr. Fitzpatrick and Dr. Moore. Dr. Fitzpatrick told me that my intestines were perforated, causing an infection for the past five to six days. He also stated that there is a third abscess up higher feeding down into the other two.

On 12/15/01 Dr. Fitzpatrick and Dr. Duke operated to expand the incisions. I was released on 12/21/01 with a catheter and on antibiotics and two shifts of visiting nurses to dress my wounds.

12/31/01. Post-operative visit to Dr. Benoit at Jamaica Plain VA. Taken off some medication. Prescribed, Tamsolosin. On 1/5/02 fainted in shower, struck head and was rushed to Jordan Hospital, Plymouth, Mass., for overnight observation. Visiting nurse called Dr. Burch at Brockton Hospital. Dr. Burch said, "They should not have put you on Tamsolosin. It lowers your blood pressure."

1/11/02. Visiting nurse noticed an infection on my wounds. Sent to Brockton VA, Dr. Aslanian, who noticed an infection on left side of wound, cleaned wound, and ordered antibiotics for me.

1/15/02. Dr. Duke at West Roxbury VA made an incision and packed the wound. On 1/29/02 Dr. Fitzpatrick examined me, said the wounds were healed, and took me off antibiotics.

2/5/02. I noticed a yellow discharge from my anus and contacted Dr. Fitzpatrick, who said to see him on February 12. On 2/12/02 Dr. Fitzpatrick was not in. I was examined by his assistant, Dr. Navarro, who noticed a pus pocket on the edge of my sphincter and yellow discharge. He squeezed out the pus. He asked for consult from a senior staff member, Dr. Gordon, who examined my anus. I asked both Doctors Navarro and Gordon if a pus pocket and yellow discharge weren't indicative of an infection, if I should be on antibiotics, and if I would need more surgery. Dr. Gordon stated, "No more operations or antibiotics are necessary." He then prescribed one to two weeks of daily fleet enemas, saying that would take care of my problem. I

R. R. Shamon claim Item 8 continued

met Dr. Fitzpatrick in the lobby, where I brought him up to date with my meeting with Dr. Navarro and Dr. Gordon and about the fleet enemas.

On 2/15/02 I was still in pain with yellow discharge and blood/pus from my anus. I called Dr. Fitzpatrick, who said to see him on February 19. On February 19 Dr. Fitzpatrick said, "Why did Dr. Gordon order fleet enemas? You're not an old woman." He didn't know why my sphincter muscle wasn't closing and said to exercise the sphincter muscle.

On February 24, 2002, I called Dr. Fitzpatrick and told him that I wanted a second opinion. He asked me to work with him a few more weeks and the problem would abate. I insisted on the second opinion. He gave me the name of Dr. Cima, whom I first saw on February 27. He kept me overnight and operated on me on February 28.

Dr. Cima found three abscesses up higher on my colon, inserted a Seton drain, inserted 18" Mallincrodt tube, found a 3 cm ulcer on the post rectal wall adjacent to the sphincter. The existing wounds were also reinfected and had to be reopened and drained.

On 3/1/02 during my recovery Dr. Fitzpatrick came to my room and said, "I'm sorry. I'm sorry. I should have looked up higher, should have seen it. You're in good hands with Dr. Cima."

As a result of all my treatment at the VA I've suffered a great deal of pain, medical procedures, and damages.

**EXHIBIT B**

HK | Hanify&King

MICHAEL R. PERRY
617-226-3464
mrp@hanify.com

May 17, 2004

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Rita S. Mandosa, Esq.
Department of Veterans Affairs
Office of Regional Counsel
200 Springs Road, Bldg. 61
Bedford, MA 01730

      Re: Ronald Shamon v. U.S. Dep't of Veterans Affairs

Dear Ms. Mandosa:

      By this letter, Ronald Shamon amends his claim filed on Standard Form 95 with the Department of Veterans' Affairs, Office of Regional Counsel on December 5, 2002. For ease of reference, a copy of Mr. Shamon's filing is included herewith.

      In addition to the claims asserted in Mr. Shamon's December 5, 2002, filing, Patricia Shamon, the wife of claimant Ronald Shamon, hereby submits a claim for loss of consortium. As a direct result of the negligence of the doctors and medical staff of the Department of Veterans' Affairs, Patricia Shamon has lost the love, companionship, care, counsel and affection of plaintiff, Ronald Shamon. In addition, Ronald and Patricia Shamon amend the amount of their claims to $1,000,000 resulting from the injuries they have suffered.

      If there any questions concerning this amendment, please contact me.

                 Sincerely,

                 Michael R. Perry

MRP/mld
Enclosure
395206

Professional Corporation    One Beacon Street
Counsellors at Law      Boston, Massachusetts 02108-3107
                       Tel: 617-423-0400
                       Fax: 617-423-0498
                       www.hanify.com

RS0248

**EXHIBIT C**

1

1 - 62

# IN THE UNITED STATES DISTRICT COURT

## FOR THE

## DISTRICT OF MASSACHUSETTS

RONALD & PATRICIA SHAMON,          )
                                   )
              Plaintiff,           )
                                   )
     -v-                           )  DOCKET NO.
                                   )  04-11674-WGY
UNITED STATES OF AMERICA,          )
                                   )
              Defendant.           )


      THE ORAL DEPOSITION OF PATRICIA SHAMON, held

pursuant to Notice, and the applicable provisions of the

Federal Rules of Civil Procedure, before Diana Strzemienski,

a Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the offices of the

United States Attorney, 1 Courthouse Way, Suite 9200,

Boston, Massachusetts, on Wednesday, March 16, 2005,

commencing at 10:10 a.m.


**COPY**

**APEX Reporting**
(617) 426-3077

36

1    Q    How long since his discharge on the 21st?

2         Did you notice any changes in his physical

3    condition?

4    A    After he was discharged?  He was very weak.  He

5    couldn't walk without assistance.  He couldn't get out of

6    bed without assistance.  He was distraught, to say the

7    least.

8         He had visiting nurses twice a day to irrigate the

9    area.

10   Q    Other than the post-op visits, do you remember the

11   next time he went to the VA?

12   A    He -- I don't know.

13        They found pus in the -- wait a minute.  He went

14   to Jordan Hospital the beginning of January because he

15   fainted in the shower.  And, he was non responsive, so I

16   called 911 because he hit his head on the faucet, and he was

17   told that this was because he was taking a diuretic.

18        A visiting nurse was there when this occurred, and

19   said to me, "I don't understand why he passed out.  Let me

20   see his medications."  And, when I showed her the many

21   bottles, she said, "He should not be taking this." And I'm

22   sorry, Mr. Wilmot, I don't know the name of it.

23   Q    Okay.

24        This is a VA nurse?

25   A    No, no, the visiting nurse.

39

1    2001, what other changes in your husband's physical

2    condition did you notice?

3         You already told me that he was weak.  At times he

4    could not walk.  What other physical conditions did you

5    notice?

6       A    Well, I had set up a hospital room in one of the

7    guest rooms, and that's where he stayed for months, and

8    months, and months.

9         He was very fearful.  I had to be--

10      Q    Before you get into emotional changes, can you

11   just tell me what physical changes you noticed after the

12   Flex-Sig on December 7th, 2001?

13      A     He couldn't sleep.  He was tearful.  He was

14   completely unable to take care of himself.

15      Q    Can you be more descriptive?

16      A    I -- well I had to bathe him.  Is this what you

17   mean?

18      Q    I'm asking what physical conditions--

19      A    Well, he was unable to bathe himself.  He was

20   unable to clean himself after a bowel movement or -- and

21   after a bowel movement he had to use a sitz bath, which had

22   to be cleaned.  He took many naps during the day.

23      Q    Anything else?

24      A    Not really.  He was very debilitated.  You don't

25   want to know about his mental--

40

```
 1      Q    Not yet.  I just want you to -- I want to exhaust
 2  your memory as to what physical changes you've noticed in
 3  your husband after the Flex-Sig procedure.
 4      A    Well, he was just very, very, weak; very sick;
 5  very -- he was--
 6      Q    When you say sick, what do you mean by sick?  Was
 7  he vomiting?
 8      A    No.  No.
 9      Q    Did he have headaches?
10      A    He had -- yes, he had -- he had an appetite loss.
11  He was just a totally different person.
12      Q    Now, when did you first notice that he was
13  suffering from headaches?
14           When did he first tell you, having headaches?
15      A    I don't know.  He was just -- he was so devastated
16  by what happened to him that he, you know, he hurt.
17      Q    Is he still suffering from headaches?
18      A    No.  No, not abnormally, no.
19      Q    Do you know when the abnormal headaches, as you
20  described it, ended?
21      A    No, it was all a process of healing, as he
22  gradually felt better.
23      Q    When would you -- do you have a memory as to when
24  he stopped complaining about headaches?
25      A    No.  It was one of many things following his
```

41

1    initial surgery; following his coming home.

2           He was -- he was fearful of, "What's going to

3    happen to me?"

4       Q    Again, before we get into the emotional changes

5    you noticed, I just want to finish through the physical

6    changes, and we will get to that.

7           You said that he could not sleep.  When did you

8    first notice that he was unable to sleep?

9       A    Right away because--

10      Q    I'm sorry, right away?

11      A    After he came home; upon his discharge.

12      Q    So, beginning on December 7th, he was unable to

13   sleep or his discharge--

14      A    21st, yes.

15      Q    So, starting on December 21st, 2001, he was having

16   trouble sleeping?

17      A    Yes.

18      Q    Does he still have trouble sleeping?

19      A    No.

20      Q    When did his trouble sleeping end?

21      A    Oh, I'd say probably after the catheter was

22   removed; I don't remember the date.  He had that probably--

23      Q    You said he--

24      A    --maybe into February.

25      Q    Of 2002?

42

1    A    Yes.  He -- he didn't want to go to bed at night,

2   and since I had to get up with him, at least twice a night

3   for the sitz baths, I used to try to get him to go to bed

4   because I was so tired, I wanted to go to sleep.

5         And, when I would say, "Good night," -- I mean his

6   eyes were wide open and he'd say, "But, I can't sleep.

7   We'll try."

8         But, he took naps during the day, and he was just

9   so -- he was afraid to go to sleep.  He didn't want to be

10  alone.

11   Q    You also told me he was tearful.  What do you mean

12  by that?

13   A    That's emotional.

14   Q    That's emotional?  All right, then we'll get back

15  to that.

16        You also said he had an appetite loss.  When did

17  you notice this appetite loss?

18   A    Immediately.

19   Q    Immediately, starting when?

20   A    December 21st.

21   Q    Does he still have that appetite loss?

22   A    No.  I'm sorry.

23   Q    When did he get his appetite back?

24   A    I would say toward the end of the year; maybe Fall

25  of 2002?

43

1    Q    Do you remember -- are any other physical changes
2  that you remember in your husband following the Flex-Sig on
3  December 7th, 2001?

4    A    No.

5    Q    Why don't you tell me about the emotional changes
6  that you noticed?

7    A    He was primarily afraid to trust any doctor.  He
8  was afraid to be alone for any time at all.

9         If I left the house to do marketing, I would rush
10 through it.  And the minute I walked through the door, he
11 would be, "Where were you?  You were gone so long.  What if
12 something had happened to me"?  He was -- he had become
13 extremely dependent, which was a complete about face.

14        He was very irritable, which he still is;
15 short-tempered; attention span is short.

16        He talks about this whole episode continuously to
17 everybody; inappropriately I think, in many cases, to people
18 who he hardly knows, and repetitiously.

19        It's just devouring him.  He's very depressed.  He
20 doesn't feel adequate.  He can't -- his strength is gone.
21 He was unusually strong, and now he can't do things.  He has
22 groin pain if he lifts anything very heavy.

23        And, there are so many things.  He doesn't do lawn
24 work; he doesn't shovel snow.

25        I mean, this is -- if he -- we used to travel.

44

1  Now he can't sit very long, so if we drive anywhere, he has

2  to keep stopping and getting out to walk around.  He was

3  told he has scar tissue which is the cause of this, and that

4  it would always be, which makes him very despondent.

5          He doesn't have interest in doing things, whether

6  it's -- he was in the middle of finishing the basement with

7  his brother -- our basement -- just prior to this, and it's

8  still sitting there.  It's too much for him.  Everything is.

9          He's irritable with our grandchildren, and a very

10  short fuse.  Our sex life is non-existent.  I don't know.

11      Q    If anything else comes to your mind, you know,

12  just bring it up so we can just -- I just want to go through

13  these with you.

14          And you said that he -- you noticed that he became

15  afraid to trust doctors.  Do you remember when that began,

16  that fear of doctors?

17      A    Progressing through his treatment until he met

18  Dr. Cima.  C-I-M-A.

19      Q    You say, until he met Cima.  So, once he met Cima

20  he wasn't afraid anymore or that fear dissipated?

21      A    He trusted Dr. Cima, but even he really -- he's

22  become quite paranoid, I think.  And, I'm not a

23  psychologist, so that's a lay interpretation, but I really

24  do feel that he has become so.

25      Q    You said he was afraid to be left alone.  Do you

45

1    remember when that began?

2         A    When he came home from the hospital, on the 21st.

3         Q    Is he still afraid to be--

4         A    No.

5              MR. WILMOT:  Ms. Shamon, you have to wait for me

6    to finish my question.  That's all right.

7              THE WITNESS:  I beg your pardon.

8              MR. WILMOT:  It's tough.  This is like a

9    conversation.

10             THE WITNESS:  I know, I know.  I'm sorry.

11             BY MR. WILMOT:

12        Q    So, I was just asking, is he still afraid to be

13   left alone at home?

14        A    No.

15        Q    When did that fear dissipate?

16        A    Gradually, I think towards the end of his

17   recuperation, after he had subsequent surgery with Dr. Cima,

18   and felt that he was not going to die any minute now, which,

19   prior to that, I think was foremost in his mind.

20        Q    Do you know what month that was or--

21        A    No.  May?

22        Q    Of 2002?

23        A    Yes.

24        Q    You said he was extremely dependent on you.  When

25   did that begin?

46

```
 1        A    When he came home from the hospital.

 2        Q    On December 21st, '01?

 3        A    Yes.

 4             I'm so sorry, Mr. Wilmot.  I'm sorry.

 5        Q    On December 21st, '01 was when his dependence

 6   began?

 7        A    Yes.

 8        Q    Is he still extremely dependent on you?

 9        A    In many ways, yes, but he doesn't know he is.

10        Q    Other than the typical ways that husbands are

11   dependent on their wives, you described it as being

12   extremely dependent obviously where it was a burden for you,

13   perhaps?

14        A    No.

15        Q    Was that a burden?

16        A    It was mentally and physically exhausting to me,

17   but -- are you saying "burden," as in did I object to doing

18   it, no.

19        Q    Right, I'm not saying that.  But, you described it

20   to me as "extremely dependent."  Those were your words.  Is

21   he still extremely dependent on you?

22        A    No.

23        Q    When would you say that extremely dependence

24   ended?

25        A    Toward the middle of summer, late summer of 2002
```

1  as he became more capable of leading a normal life, so to

2  speak.

3      Q    You say late summer?  You mean July, August?

4      A    August.

5      Q    You said that he became very irritable, was he --

6  prior to his being released from the hospital in December

7  21st, 2001, was he not irritable before that?

8      A    You mean in the years before?

9      Q    Right.

10      A    No, he was not.

11      Q    So, you noticed specifically that he became

12  irritable after this, after he was released from the VA?

13      A    Correct.

14      Q    Is he still irritable?

15      A    Yes, sir.

16      Q    With confidence.

17          In what ways?

18      A    Everything.  He's very short-tempered.  Everything

19  bothers him, things which I feel are not -- that's life.

20          For instance, driving, road rage personified.

21      Q    And he had not exhibited these type of traits

22  before?

23      A    No, not at all.

24          What else?  He's short-tempered even watching

25  television, with neighbors, with interaction.  Everyone is

48

1  annoying at some time.  We all have our moments.

2          If -- I don't know -- little things around the

3  house that are part of daily living, he can explode very

4  easily.  And he doesn't mean to and he's sorry he does it,

5  but it happens.

6      Q    You said also that he developed a short attention

7  span.  When did that begin?

8      A    At the same time.

9      Q    After December 21st, so on?

10     A    Yes.

11     Q    And he still has a short attention span?

12     A    Yes.

13     Q    And he did not have one beforehand, before

14 December 21st, 2001?

15     A    No.  He was a fun, interesting, very gregarious --

16 as he still is -- person but light-hearted and different.

17     Q    You also said that he became depressed.  When did

18 you first notice depression in your husband?

19     A    He sat -- he has a recliner in the family room,

20 and he sat for hours on end, staring out through the sliding

21 glass doors at the trees and the sky, meditating and feeling

22 very sorry for himself, and thinking that he was never going

23 to be the same man he was before.

24     Q    Now what type of things was he saying to you to

25 make you think that he -- that's how he felt?

49

1      A    "I can't lift anymore.  I get -- I can't -- at

2  this point, I can't even drive the car. I wonder if I ever

3  will be able to do anything that I used to do."

4           We had an emergency trip to Tennessee in -- I

5  think it was April of that year, which was memorable.  Did

6  you ever push a wheelchair with his size on a carpet through

7  airports, and it just -- he was unable to live his life as

8  he had in the past.

9      Q    And, when did you first notice that he was

10 depressed about all these things?

11     A    I would say immediately, because he kept saying,

12 "Why did this happen to me.  Why me.  What did I ever do to

13 deserve this?"

14          "I had -- I should have gone to somebody else.

15 Why did I have this person who hurt me, who caused all my

16 trouble--"

17     Q    Now you said, "immediately," you mean, immediately

18 after December 21st,'01?

19     A    Yes, when he was home, because we were home -- we

20 were there by ourselves.

21     Q    Is he still depressed?

22     A    I would say so, yes.  I mean, it's not as

23 specifically -- well now it is because of the--

24     Q    Take your time.

25     A    Oh, because of coming here and so forth.  But,

53

1      Q    And, did your husband see anyone?

2      A    No, because he thinks that's being weak.

3      Q    And you also said, you noticed -- I'm sorry -- you

4 said you noticed a loss of strength in your husband?

5      A    Oh, yes.  Tremendously.

6      Q    And when did you first notice that?

7      A    When he came home from the hospital.

8      Q    On December 21st, 2001?

9      A    Yes.

10     Q    Does he still suffer from the loss of strength?

11     A    Yes.

12     Q    You said there's housework he is unable to do now?

13 Is that correct?  I believe you said--

14     A    What house -- not house work as in dusting and you

15 know--

16     Q    Yard work.

17     A    Right.

18     Q    So, he's -- he no longer mows the lawn.  Is that

19 what you said?

20     A    He mows the lawn very rarely, when it gets

21 extremely high, and our son-in-law can't do it, and he does

22 it in little dribs and drabs, and he's totally out of

23 breath, and has to come in and sit down.  Yeah, he does it,

24 but not very often.

25     Q    Sounds like me.

54

1    A    And, your excuse is?

2    Q    Shoveling snow.

3    A    I do it.

4    Q    You do it?

5         And, you've been doing it since when?

6    A    2001.

7    Q    Now you were saying you do not travel, but you

8    just said that you were in Florida?

9    A    Well, we can't -- what I -- I'm sorry, we don't.

10   We can't travel as we did before.

11        We -- if we fly, he has to sit up in front in the

12   aisle seat. For no reason, it's just -- he's a different

13   person psychologically. And, if we drive, I do most of the

14   driving, and we stop very frequently so he can get out and

15   stand up and walk around.

16   Q    And, this is because he cannot sit long?

17   A    Yes.

18   Q    And, when did you first notice that?

19   A    Immediately. He has to sit on his donut.

20   Q    And, when you say, immediately, you mean

21   immediately after he was released?

22   A    Yes.

23   Q    You said -- you mentioned also that he has scar

24   tissue. When did you first hear about the scar tissue?

25   A    From Dr. Cima.

55

1    Q    When was that?

2    A    I don't know when Dr. Cima saw him, Mr. Wilmot.

3    Q    Okay.

4    A    I'm sure it's in the chart.

5    Q    Is it your belief that he still has this scar

6    tissue?

7    A    Oh, yes, he does.

8    Q    You said he has a lack of interest in doing

9    things, as well.  When did you first notice that?

10   A    Right away.  Everything is too much effort.

11   Everything is -- or he'll plan to do something, and then it

12   just doesn't get done.  It's not important any more.

13   Q    And that began in December of 2001?

14   A    Yes.

15   Q    And, he still lacks this interest in doing things?

16   A    Right.

17   Q    Has it gotten any better?

18   A    That's hard to say.  If I press it, sometimes I

19   can get him to do it.  And other times, he explodes.  You

20   know, I never know how he's going to react.

21        Something that's very important to accomplish

22   today, is sort of just forgotten about tomorrow.

23        And I don't mean to make him out as a terrible

24   person, and that's how I'm sounding, because he can't help

25   it.  He really is a good guy.

56

1    Q    The loss of strength.  Has that gotten any better

2 since December 21st, 2001?

3    A    Well, of course.  He -- I don't have to help him

4 walk around or get in and out of bed, or so on.  But, his

5 endurance is non-existent.  It's just...

6    Q    I think you said also that things are too much for

7 him, since --

8    A    Well --

9    Q    -- I'm sorry, you said still -- said somewhat to

10 him not having any interest in doing things?

11    A    Well, if there are obstacles, it's hard for him to

12 stay focused.  I can't think of another example at the

13 moment.

14    Q    And, when did that begin; that things overwhelmed

15 him?

16    A    Same time.

17    Q    And, he still suffers from that?

18    A    Yes.

19    Q    Has that gotten any better?

20    A    Somewhat.

21    Q    I apologize for going through this last bit of

22 questioning.

23         You said, as well, your sex life is non-existent.

24 When did you notice that change in that aspect of your

25 relationship?

57

```
 1        A    Obviously, December 7th, but--

 2        Q    From December 7th, forward?

 3        A    Correct.

 4        Q    And, it's still the case today?

 5        A    That is correct.

 6        Q    Has that improved at all since December 7th, 2001?

 7        A    Not really.

 8        Q    When you say non-existent, you mean, none

 9   whatsoever?

10        A    No, occasionally.

11        Q    When did it first start -- I'm sorry about this.

12   When did it first start back up again?

13        A    In the fall of 2002.

14        Q    How -- everything you described to me in terms of

15   his -- the changes in his physical and mental condition

16   since the Flex-Sig procedure, on December 7th, 2001, how has

17   it affected you?

18        A    I've spent a lot of time crying in private and

19   trying not to be sorry for myself, and you know, he--

20             Why do I have to keep saying these things.  I

21   don't--

22        Q    Do you want to take a moment?

23        A    No.  What difference does it make?  You know,

24   you're making me sound like I'm a terrible person and I hate

25   him, and I don't mean that.
```

58

1          MR. WILMOT:  Can we go off the record for a
2    moment?
3          (Off the record at 11:47 a.m. to 12:02 a.m.)
4          BY MR. WILMOT:
5    Q    You were just describing how your husband's
6    physical and emotional conditions have affected you, and you
7    said there were times that you, you know, you've cried and--
8    A    Still do.
9    Q    Yes.  Can you tell me about anything else?
10   A    Yes.  I overeat.  I was very thin when this
11   occurred, and I soothed my ruffled feelings by eating, which
12   I never did before.
13         And I think I'm irritable.  It's -- I sort of
14   fight back which I shouldn't.
15         And, I don't sleep well.  I really -- I'm sure
16   that his health is okay, but I live in constant fear when he
17   is out of the house that something is going to happen to
18   him.
19   Q    When you say something may happen to him.  Like
20   what?
21   A    That he will get sick or have an accident or--
22   Q    Does he mean fear of anything happening to him?
23   A    Yes, because he says frequently, "With your family
24   history, you're going to live to be a hundred and I'm not
25   going to live long."  He says it all the time, and it's --

59

1   you know, I don't want this to happen.

2        Q    Anything else?

3        A    No.

4             MR. WILMOT:  I don't have any further questions.

5   But I just want to put in the record that I haven't received

6   the documents from the Request for Production of Documents

7   that I served or any initial disclosure documents yet.  So,

8   to the extent, when I receive your documents, if there is

9   some issue or something that's in those documents I need to

10  explore further with Ms. Shamon, I just want to reserve the

11  right to recall her as a deponent.

12            MS: SUGARMAN:  That's all right.

13            MR. WILMOT:  That's all I have.

14            MS. SUGARMAN:  I have no questions.

15            MR. WILMOT:  We're all done.

16            (Whereupon, at 12:05 p.m., the proceeding was

17  concluded.)

**EXHIBIT D**

**H<** | **Hanify&King**

RECEIVED
U.S. ATTORNEY

07 JUL -5 PM 4: 06

**MICHAEL R. PERRY**
Direct Dial:  617-226-3464
Direct Fax:  617-305-0664
Email:     mrp@hanify.com

June 30, 2005

Damian Wilmot, Esq.
United States Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

> Re:  Shamon v. United States
>     U.S.D.C. 2004-11674-WGY

Dear Damian:

I write in response to your letter of June 9, 2005. Because your letter does not accurately reflect Plaintiff's position regarding the amount of Mr. Shamon's claim, I feel compelled to clarify the record on this issue.

As you know, on December 4, 2003, the Plaintiff, Ronald Shamon, filed an administrative claim form in which he alleged negligence on the part of various agents and employees of the defendant. In the section of the form entitled "Amount Claimed" Mr. Shamon indicated that he was seeking $500,000 in damages as compensation for personal injuries that he sustained as a result of the Defendant's negligence.

On April 20, 2004, I sent a demand letter to Rita Mandosa, a staff attorney with the VA Regional Counsel's office. This demand letter related solely to Mr. Shamon's claims, and made no mention whatsoever of Mrs. Shamon's loss of consortium claim. In the final paragraph of this demand letter, I demanded $1,000,000 in full and final settlement of Mr. Shamon's claim. Thus, as of April 20, 2004, the VA Hospital was well aware that Mr. Shamon's individual claim was being valued at $1,000,000, not the $500,000 amount referenced on his original claim form.

On May , 2004, I sent a second letter to Ms. Mandosa. The purpose of this letter was twofold. First, by this letter, the Plaintiff amended his administrative claim to add a loss of consortium claim on behalf of his wife, Patricia Shamon. Second the letter increased the amount of the Shamon's individual claims to $1,000,000 each. Specifically, the letter states, in pertinent

Professional Corporation
Counsellors at Law

One Beacon Street
Boston, Massachusetts 02108-3107
Tel:  617-423-0400
Fax:  617-423-0498
www.hanify.com

⊢<     Hanify&King

Damian Wilmot, Esq.
June 30, 2005
Page 2

part, "In addition, Ronald and Patricia Shamon amend the amount of their claims to $1,000,000
[each] resulting from the injuries they have suffered." By referring to the Plaintiffs claims in the
plural, the letter clearly indicates that the Plaintiffs were seeking $1,000,000 *each* for the injuries
that they sustained as a result of the Defendant's negligence. This position is entirely consistent
with the April 20 demand letter which valued Mr. Shamon's individual claim at $1,000,000. At
no time did the Plaintiff value Mrs. Shamon's loss of consortium claim at $500,000.

Further, your assertion that the Defendant considered the Plaintiffs claims' to be of equal
value is belied by the VA Tort Claim Information System Data Collection form produced by the
Defendant during the course of discovery (See attached claim form). This claim form identifies
Mr. Shamon's claim as the "Primary" claim. In light of the information contained on this form,
the Defendant cannot credibly claim that it considered the amount of Mrs. Shamon's claim to be
equal to that of her husband.

Moreover, in your letter you assert that the plaintiff "may recover above the amount of
damages sought in the administrative claim only where the increased amount is based upon
newly discovered evidence not reasonably discoverable at the time of presenting the claim to the
federal agency, or upon allegation and proof of intervening claim facts, relating to the amount of the
claim." This is simply incorrect. While a plaintiff is barred from recovering in a civil action an
amount greater than the amount claimed in his administrative claim absent "newly discovery
evidence," it is expressly set forth in agency regulations that an administrative claim, including
the sum certain, can be amended "by the claimant at any time prior to final agency action" so
long as the initial claim was in compliance with the regulations and the amendment is submitted
in writing and signed by the claimant or his or her duly authorized agent or legal representative.
See 28 C.F.R. § 14.2(4)(c). See also 38 C.F.R. § 14.604(c) (same). Thus, where a plaintiff
timely amends his administrative claim during its pendency and prior to final agency action to
increase the sum certain, the plaintiff's recovery in a subsequent civil action is not capped by the
original amount claimed and the plaintiff is entitled to recovery up to and including the amended

H‹    Hanify&King

Damian Wilmot, Esq.
June 30, 2005
Page 3

sum certain.  See Kirby v. Marsh, 624 F. Supp. 1100, 1101-02 (M.D. Ala. 1985) (prior to final agency action, claimant amended administrative claim to increase damages sought from $350,000 to $1,000,000; plaintiff not precluding from recovering $1,000,000 in civil action").

        Further, when filing their administrative claim,  the plaintiffs were not required to specify a separate dollar amount for their individual claims. "The purpose of Section 2675's sum certain" requirement is to facilitate settlement and to determine whether the claim exceeds $25,000 (in which case the decision must be approved by the Attorney General…Identification of the total amount of a couple's collective damages is adequate for this purpose. None of the Fifth Circuit cases cited by the government stand for the proposition that spouses cannot submit a claim for a single lump sum. Indeed, many courts have held that a lump sum amount for multiple claimants satisfies the "sum certain" requirement. Eskine v. United States, 1995 WL 495903 (E.D.La.), Lunsford v. United States, 570 F.2d 221, 225 (8th Cir. 1977).

        Please feel free to contact me with any questions that you may have regarding the above.

                                            Sincerely,

                                            Michael R. Perry

MRP/pm
432022

# VA TORT CLAIM INFORMATION SYSTEM
## DATA COLLECTION FORM

**PATIENT:** Shamon, Ronald R.                                      **SSN:** 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

## INJURED PERSON INFORMATION

█████████ Shamon, Ronald R.                    ████████████ Self
████████ April 27, 1936

## CLAIMANT INFORMATION

**Claimants**                                  **Relationship to Injured Person**
Shamon, Ronald R.        **(Primary)**          Self
Shamon, Patricia                                Spouse

## INCIDENT INFORMATION

████████████ 12/7/2001

**VA MEDICAL CENTERS**            **Number**   **VISN**   **State**
Boston MA VAMC                    523         1          MA

**VAMC SERVICES**                 **LOCATION OF INCIDENT**
112   Surgical                    Operating Suite

**SPECIALTY CODES**               **INJURY CODE**
15   Gastroenterology             Surgery Related

**ALLEGED NEGLIGENCE CODE:**      **SEVERITY**
250   Improper Performance Of Surgery    2      Major

## ALLEGED NEGLIGENCE DESCRIPTION

PERFORATION OF INTESTINE DURING SIGMOIDOSCOPY, FOLLOWED BY REPEATED INFECTIONS, AND MULTIPLE CORRECTIVE SURGERIES AND
HOSPITALIZATIONS FROM DECEMBER 2001 THROUGH MARCH 1, 2002.

## LEGAL INFORMATION

████████████ Bedford              ████████████ (781) 687-3600
████████████ 12/4/2003            ████████████
████████████ $1,000,000.00        ████████████ 06/30/2004
████████████                      ████████████

████████████                      ████████████ Perry, Michael
████████████                      ████████████

**Tort Status**
06/30/2004   02   Claim Denied by Regional Counsel
12/04/2003   00   Administrative Tort Claim Pending

## REMARKS

Case No   22676                                    Generated 06/30/2004